## HOEFFNER v. NATIONAL S. S. CO.

(Circuit Court of Appeals, Ninth Circuit. October 20, 1924. Rehearing Denied November 17, 1924.)

No. 4308.

1. Shipping ⬤═86(2)—Fall of longshoreman from moving ship held pure accident.

Evidence *held* to show fall of longshoreman into water from moving ship, while attempting to put sling around lumber on deck, was pure accident, to which no negligence contributed.

2. Shipping ⬤═84(1)—Shipowner held not liable for failure to rescue longshoreman falling from moving vessel.

Shipowner *held*, under the circumstances of the case, not liable by reason of failure or neglect to rescue longshoreman accidentally falling into water from moving vessel.

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Benjamin F. Bledsoe, Judge.

Libel in admiralty by Christina M. Hoeffner, as administratrix of the estate of John H. Hoeffner, deceased, against the National Steamship Company. Judgment for defendant, and plaintiff appeals. Affirmed.

John J. Monahan, of San Pedro, Cal., for appellant.

Joe Crider, Jr., of Los Angeles, Cal., and Hettman & Hoge, of San Francisco, Cal., for appellee.

Before GILBERT, ROSS, and RUDKIN, Circuit Judges.

ROSS, Circuit Judge. The appellant, as administratrix of the estate of her deceased husband, John H. Hoeffner, libeled the appellee steamship company for damages in the sum of $20,000, and for $5,000 as exemplary damages, alleging, among other things, in substance, that on April 15, 1922, while the appellee's schooner Brunswick was in San Pedro harbor, Los Angeles, the deceased was employed to assist in the unloading of the schooner's cargo of lumber; that "while he was engaged in making up slings of lumber, so as to have them ready when the unloading should begin, the said vessel got under way and proceeded upstream from the San Pedro Lumber Company's dock, in San Pedro harbor, to which the vessel had been moored, to Blinn's lumber dock, also in said harbor of San Pedro; that while said John H. Hoeffner was so engaged, and the ship was proceeding upstream as aforesaid, the sling yielded a little, so that he tripped and fell overboard; that there were no life lines or life rails on the side of said vessel where the deceased was working, so that he could be protected; that the said vessel negligently continued on her way after deceased was precipitated into the water, and she proceeded about 500 feet upstream before stopping; that no boat was lowered to pick up the deceased, and that there were no life buoys thrown, and no effort was made, either by the master or crew of the said vessel, to save the deceased; and that as a result thereof the deceased came to his death by drowning."

The libel contained various other allegations respecting the alleged failure of the appellee to furnish and maintain a safe and suitable place for the deceased to work, to provide competent seamen or a sufficient number of seamen, to provide life rails or lines on that part of the deck where the deceased was employed, and the alleged neglect of the master or crew of the schooner to do anything for the rescue of the deceased after his falling overboard. Upon the coming in of the respondent's answer the case was referred by the court to its commissioner directing him to take testimony, make findings of fact, and recommend appropriate conclusions of law, which he did to the effect that the libelant was entitled to recover from the respondents the sum of $14,400 as compensatory damages and an additional $1,000 as punitive damages.

After full and careful consideration the

court below sustained exceptions to the commissioner's report, and re-referred the case to him for a new hearing, or for such other action as might be deemed appropriate by the respective parties. The libelant having failed to take any further action, a final decree of the court was entered dismissing the libel.

[1] The evidence in the case shows that the deceased and one Gallagher were employed as longshoremen to unload the lumber that was on the deck of the schooner at its forward end, a part of which had just been unloaded at the San Pedro yard. The deceased and Gallagher were employed just before the vessel was to be moved from the San Pedro to the Blinn yard. The testimony of Gallagher, which seems to be the clearest and most specific regarding the manner in which the accident happened, is as follows:

"Mr. Asherman was sent on the dock to loosen the lines, to let go the ship. They were going to move; that is, to the Blinn yard from the San Pedro yard. Mr. Hoeffner came to me and said, 'I'll work partners with you.' I said, 'Very well.'

"Q. Is this Mr. Hoeffner, the deceased in this case? A. Yes; at that, the mate told us to go on to work. I looked at the clock in the wheelhouse. It was exactly 3 minutes after 8. We went forward, which I would call, well, the forward end of the ship, to prepare the loads of lumber that was to be discharged at Blinn's, which consisted of redwood. I consider the planks about 2 by 12 and about 25 to 30 foot long. They were about 6—well between 5 and 6—high, with a double plank, which meant about 12 inches high and about 24 inches wide. I went forward, and I got a sling, to the poop deck. There was some slings on the poop deck; that is, at the end of the lumber where the winch driver and a man— I forget whether the mast stands fore or aft; yes, it stands forward, the mast, I am pretty sure. And I unloosened one of these slings, and took it down and stuck it under the lumber pile, the load we had already prepared; that is, it was prepared. We didn't prepare the loads. The loads were all prepared, that was laying on the top of the deck. I shoved the sling under, and where the splice connects on the string there was threads on that splice which was hard to get through; so he leans over the load and pulls it with his hand, and he gets it pretty near through. I said, 'We will pull the sling back to get it in the center of our load.' Well, in doing so, he couldn't get it back.

So he stood on top of his load, exactly like this (illustrating), and he reached down to get hold of the sling and give a pull, and the board he was standing on turned, and he slipped right off back; that is, facing the ship with his back towards the water. At that time, the winchman, he hollered, 'Man overboard!' I guess he and I were the only two who seen him go overboard. I looked over the side. The ship was going. He hit the rail, the guard on the side, with his two hands. It was just like saying, one, two, three. He hit that guard with his hands, and the ship had gone by him. I had it in mind to take one of those planks and throw, but it was useless, they were too big. I thought it was the mate who hollered, 'Get a life buoy!' I ran aft to where this life buoy was on the starboard side. I would call it about the starboard beam—that is, the stern—and it was fastened onto the rail. There was, well, a line; it is onto the life buoy, I think; it is about half-inch, to my judgment, a half-inch line. That line had the buoy tied to the guard rail, called a slat knot on it; a flat knot on it, a square knot, is what the sailors say, and that line was wet. I tried to get that line loose, and I worked on it. Again the time I did that, we were three ship lengths away from the man in the water. The man in the water was following us, just paddling in the water. I hollered as loud as I could, and drawed this man's attention that was on the dredge, with this launch and the skiff with the launch at the dredge pipe line. They heard the calls. They started over. Then the pilot boat was coming up the bay; the pilot boat, seeing this launch coming across from the dredge line; that is, he drawed the pilot man's attention, who wondered what he was running ahead of him for."

On recross-examination of Gallagher by the proctor for the appellant, he asked the witness:

"Q. You stated you had some talk with the captain immediately after the man Hoeffner disappeared from view in the water. What did he say and what did you say to him?"

Several objections to the question having been interposed by the proctor for the appellee, to which the commissioner added, "That would be hearsay, wouldn't it?" to which the proctor for the appellant answered: "No; res gestæ, one of the exceptions to hearsay. Honestly, it is."

"The Commissioner: Let him answer it; overruled.

"A. I went to the captain; he was in the pilot house; he said to me, 'The man is to blame.' I said, 'Now, listen here, captain; you can't blame that man; you can't blame the man, and can't blame yourself.' I said, 'It was a pure, simple accident.' 'Well,' he said, 'I guess you are right.' I said, 'Those things is going to occur to any of us any day'—which he agreed with me on."

A careful reading of the evidence in the case satisfies us that the unfortunate fall of the deceased into the water was a pure accident, to which accident the appellee did not contribute by any of the alleged neglects or failures on the part of the vessel or of her master or crew.

[2] It remains only to consider whether the appellee became liable in damages by reason of any failure or neglect to rescue the unfortunate Hoeffner. The evidence shows that at the time he fell overboard the vessel was in motion at a speed stated to be from two to three miles an hour, and that as soon as he fell the cry "Man overboard!" was made by the winchman, and that as soon as it was heard by the master of the vessel he ordered it stopped as promptly as the circumstances admitted of, which was done. Gallagher, the evidence shows, ran to one of the life preservers on the vessel for the purpose of throwing it to Hoeffner, but apparently did not know how to remove it from its place, and while attempting to do so one of the crew, according to the testimony of the latter, came running up and without difficulty took it from its place and threw it into the water for the unfortunate man.

The evidence shows that—the vessel being in motion at from about two to three miles an hour—Hoeffner was swimming several hundred feet behind it, struggling to maintain his head above water; that the calls of those on board the vessel attracted the attention of a nearby pilot boat and two small power boats, each of which speedily went to his rescue, the pilot boat reaching him just as he was sinking for the last time, and so nearly rescued him as to touch the tips of his fingers and to get the cap from his head. It is, we think, perfectly clear from the evidence that all of those boats reached the place where the deceased was struggling for his life much sooner than any lifeboat from the schooner could have done, however many such boats it had carried, and however speedily its crew could have launched one.

Under such circumstances, we find it unnecessary to decide the questions raised by the proctor for the appellant regarding the equipment of the schooner and the competency of her master and crew.

The judgment is affirmed.